IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
HUNTINGTON DIVISION

| | | |
|---|---|---|
| OHIO VALLEY ENVIRONMENTAL COALITION, INC., et al., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 3:11-0149 |
| UNITED STATES ARMY CORPS OF ENGINEERS, et al., | ) ) ) | |
| Defendants. | ) ) | |

PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION
FOR SUMMARY JUDGMENT AND DECLARATORY AND PERMANENT
INJUNCTIVE RELIEF

JAMES M. HECKER
Public Justice
1825 K Street, N.W. Suite 200
Washington, DC 20006
(202) 797-8600

JOSEPH M. LOVETT
DEREK O. TEANEY
Appalachian Mountain Advocates
P.O. Box 507
Lewisburg, WV 24901
(304) 645-9006

Counsel for Plaintiffs

## Table of Contents

Introduction ...........................................................................................................1

Facts .....................................................................................................................1

Procedural History................................................................................................1

I.      After the Corps' Voluntary Remand, Its Permit Decision Still Violates the CWA
        and NEPA ....................................................................................................2

        A.      The Corps' Determination that Mining Activities in the Dingess Run
                Watershed Will Have Insignificant Cumulative Effects Under the CWA
                and NEPA Is Arbitrary and Capricious ............................................2

                1.      The Corps' Finding of Cumulative Insignificance Is Arbitrary and
                        Capricious Because Dingess Run Is Already Biologically Impaired,
                        in "Poor" Condition, and Exceeds Water Quality Standards. .............6

                2.      The Corps' Finding of Cumulative Insignificance Is Arbitrary and
                        Capricious Because Freeze Fork, a Tributary in the Cumulative
                        Impact Area, Is Already Biologically Impaired and Exceeds Water
                        Quality Standards ..................................................................7

                3.      The Corps' Finding of Cumulative Insignificance Is Arbitrary and
                        Capricious Because Selenium Levels in Dingess Run and Its
                        Tributaries, Including Freeze Fork and Reylas Fork, Already
                        Exceed Water Quality Standards ..............................................8

                4.      The Corps' Claim that Highland's Mine Would Not Make the
                        Existing Biological Impairment and Selenium Non-Compliance
                        Worse Is Arbitrary and Capricious ...............................................12

                        i.      The Mine Will Potentially Contribute Additional
                                Conductivity ...................................................... 13

                        ii.     The Mine Will Potentially Contribute Additional
                                Selenium...............................................................14

        B.      The Corps' Reliance on Compensatory Mitigation for its Determination
                That the Mine Will Not Cause Significant Degradation Under the CWA or
                Significant Impacts Under NEPA Is Arbitrary and Capricious ...............15

        C.      The Corps' Reliance on a Mitigation Plan That Was Unavailable For
                Public Comment Violates the Public Notice and Participation
                Requirements of the CWA and NEPA............................................20

**II.      The Court Should Remand the Permit, Require a New Public Comment Period, and Enjoin Any Permit Activities**..................................................................**23**

**Conclusion** .................................................................................................................**25**

## Introduction

Plaintiffs challenge the U.S. Army Corps of Engineers' ("the Corps") March 4, 2011 decision to issue a § 404 permit under the Clean Water Act (CWA), 33 U.S.C. § 1344, to Highland Mining Company ("Highland") for its Reylas Surface Mine in Logan County, West Virginia. Plaintiffs contend that the Corps' decision violates the CWA and the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321.

## Facts

In March 2008, the Corps notified the public that it proposed to issue an individual § 404 permit to Highland to build a large valley fill burying over two miles of streams in several tributaries of Dingess Run, which flows into the Guyandotte River. Tab 18, p. 2.[1] Plaintiffs filed timely comments objecting to issuance of the permit. Tab 20. In March 2009, the U.S. Environmental Protection Agency ("EPA") sent a letter to the Corps recommending denial of the permit and concluding that its issuance "will result in substantial and unacceptable impacts to aquatic resources of national importance." Doc. #30-1, Tab 46, pp. 1, 5. Despite EPA's letter, the Corps issued the permit in March 2011. Tab 105. In its Combined Decision Document (CDD) and Environmental Assessment (EA), the Corps made a Finding of No Significant Impact (FONSI), concluding that the project would not cause significant degradation of waters of the U.S. and would have insignificant environmental impacts. Tab 104, CDD, pp. 101-02. As a result, the Corps did not prepare an Environmental Impact Statement (EIS) under NEPA.

## Procedural History

Plaintiffs filed their Complaint in March 2011 and moved for declaratory and injunctive relief in April. Doc. #1, 29-32. Plaintiffs' motion raised six permit deficiencies involving the

---

[1] Tab numbers refer to the administrative record filed with the Court. Doc. #s 16-2, 18.

failure to mitigate increased stream conductivity, inadequate consideration of practicable alternatives to minimize stream impacts, insufficient compensatory mitigation, inadequate consideration of cumulative impacts, inadequate public notice, and the failure to analyze adverse selenium impacts.  In response to that motion, the Corps administratively suspended Highland's permit, and the Court granted the Corps' motion to remand that permit.  Doc. #37, 38.  In September 2011, the Corps reinstated Highland's permit without making any modifications and notified the Court of that reinstatement.  Doc. #45.  In its accompanying supplemental decision document, the Corps addressed only one of the six claims that Plaintiffs raised in their prior motion—the practicality of alternatives to reduce stream impacts.  Doc. #45-1.  Plaintiffs are withdrawing that claim and moving for summary judgment on their claims regarding cumulative impacts, mitigation, and public notice.  Plaintiffs reserve their remaining claims for trial.

I.     **After the Corps' Voluntary Remand, Its Permit Decision Still Violates the CWA and NEPA**

     A.     **The Corps' Determination that Mining Activities in the Dingess Run Watershed Will Have Insignificant Cumulative Effects Under the CWA and NEPA Is Arbitrary and Capricious**

The 404(b)(1) Guidelines prohibit the Corps from approving fill activities that would cause or contribute to "significant degradation" of waters of the United States.  40 C.F.R. § 230.10(c).  This prohibition requires the Corps to measure "effects contributing to significant degradation considered individually <u>or collectively</u>," and therefore requires an accurate analysis of the cumulative effects "of a number of individual discharges of dredged or fill material" on the same aquatic ecosystem where the permit activities are proposed.  <u>Id.</u> (emphasis added); § 230.11(g).  The Corps "shall collect information and solicit information from other sources about the cumulative impacts on the aquatic ecosystem. This information shall be documented and considered during the decision-making process concerning the evaluation of individual permit

2

applications . . . ."  § 230.11(g)(2).[2]

NEPA similarly requires the Corps to prepare an EIS for major federal projects that have "significant" environmental effects, both individually and cumulatively.  42 U.S.C. § 4332(2). Cumulative impact "is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions."  40 C.F.R. § 1508.7.  "Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment."  Id., § 1508.27(b)(7).  "An agency's refusal to prepare an environmental impact statement is arbitrary and capricious if its action might have a significant environmental impact."  State of N.C. v. FAA, 957 F.2d 1125, 1131 (4th Cir. 1992) (emphasis added).  To justify a determination that an EIS is not required, an agency must prepare an EA which takes a "hard look" at whether the environmental impacts of a proposed action are significant.  Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 350 (1989).

The Corps performed a cumulative impact analysis under the CWA and NEPA.  CDD, pp. 73-84.  It defined the cumulative impact area as the Dingess Run watershed.  CDD, p. 74. The Corps found that the cumulative impacts of past, present and future coal mining and other development activities would affect 44% of that watershed's land area and 25% of its stream length.  CDD, p. 108.  Nevertheless, the Corps discounted these effects as cumulatively insignificant because it claimed that "[r]ecent water quality and biological data has indicated the watershed is sufficiently absorbing the impacts without significant aquatic impairment and/or

---

[2] The Corps' regulations provide that it must analyze 404 permit applications "for compliance with applicable . . . water quality standards, during the construction and subsequent operation of the proposed activity."  33 C.F.R. § 320.4(d).   While the Corps can defer to state water quality certifications for this analysis in certain situations, that deference is negated where, as here, EPA has specifically advised the Corps in writing that Highland's project would violate water quality standards.  Id.; Tab 46, Doc. #30-1, pp. 2-3 ("evidence to date shows that valley fills permitted for this mining operation will lead to impairment of the aquatic life use and would therefore result in a violation of West Virginia's water quality standards.").

degradation." Id. at 83-84.  The Corps believed that "no compelling data has been presented to indicate the aquatic resources within the watershed have experienced such adverse impacts that they cannot provide the functions necessary to maintain aquatic life and its supporting ecosystem." Id.  See also CDD at 78 (water quality "has not been impacted to a level of significance" and the "watershed would continue to assimilate the mining activities that are occurring"); id. at 82 (Dingess Run Watershed "has good water quality"); id. at 84 (the watershed "continues to provide a functioning aquatic ecosystem with good water quality"); id. at 87 ("no compelling evidence . . . that these [mining] activities [in Dingess Run] . . . have significantly degraded the aquatic environment. . ."  ". . . Dingess Run . . . contains a viable aquatic community").  In other words, the Corps' rationale is that the Reylas mine would have cumulatively insignificant effects on water quality in Dingess Run because similar past mines in the same watershed are not causing any significant harm to its water quality.

That finding of insignificance is arbitrary, capricious and clearly erroneous, in two fundamental respects.  First, the Corps' finding is directly inconsistent with the indisputable facts that (1) Dingess Run is listed by WVDEP as biologically impaired and (2) Dingess Run, as well as the Freeze Fork tributary to Dingess Run directly adjacent to Highland's mine site, have low stream integrity scores that fall below West Virginia's narrative water quality standard for biological integrity.  Second, the Corps' finding is directly inconsistent with the indisputable fact that Dingess Run and its tributaries, including Reylas Fork where the Highland mine is sited and Freeze Fork adjacent to that mine site, currently have selenium levels that exceed West Virginia's water quality standard for that pollutant.

These exceedances of water quality standards for biological integrity and selenium, by themselves, show that the cumulative impacts of existing mining on water quality in the Dingess

Run watershed are already significant.  Sierra Club v. Penfold, 857 F.2d 1307, 1320 (9th Cir.

1988) (affirming district court decision that cumulative effects of placer mining were significant

under NEPA because those mines had caused exceedances of state water quality standards).

Those effects would be cumulatively significant even if the additional pollution contributed by

Highland's new mine were incrementally insignificant.  Under NEPA, cumulative significance is

measured by "[w]hether the action is related to other actions with individually insignificant but

cumulatively significant impacts."  40 C.F.R. § 1508.27(b)(7).  Similarly, the CWA's 404(b)(1)

Guidelines recognize that "[a]lthough the impact of a particular discharge may constitute a minor

change in itself, the cumulative effect of numerous such piecemeal changes can result in a major

impairment of the water resources. . . ."  40 C.F.R. § 230.11(g)(1).  The Corps has not proposed

any mitigation of these significant cumulative effects.  See Te-Moak Tribe of W. Shoshone of

Nevada v. U.S. Dept. of Interior, 608 F.3d 592, 604 (9th Cir. 2010) ("The EA, however, fails to

explain how Cortez will mitigate or avoid impacts to the different resources resulting from the

other existing, proposed, or reasonably foreseeable projects").  The proposed mitigation would

only address, at most, Highland's incremental additional pollution.  Thus, even if Highland's

mitigation were successful, it would not prevent or reduce cumulatively significant degradation

in the relevant watershed.  Since the CWA prohibits cumulatively significant degradation, and

NEPA prohibits cumulatively significant effects without preparation of an EIS, the Corps'

finding of insignificant cumulative effects is fatally flawed.

  In effect, the Corps based its finding of insignificance only on the incremental effects of

Highland's individual mine, not on the cumulative effects of all mining in the Dingess Run

watershed.  It reasoned that the cumulative effects are insignificant if the incremental effects of

Highland's mine are insignificant.  But that is merely an individual analysis, not a cumulative

analysis.  As we show below, the facts indisputably show that the cumulative effects are significant.

1.      **The Corps' Finding of Cumulative Insignificance Is Arbitrary and Capricious Because Dingess Run Is Already Biologically Impaired, in "Poor" Condition, and Exceeds Water Quality Standards**

Contrary to the Corps' finding, Dingess Run is not in good condition.  WVDEP has listed the <u>entire length</u> of Dingess Run as biologically impaired and placed it on the CWA 303(d) list of sites that are violating water quality standards.  33 U.S.C. § 1313(d); Doc. # 30-10, West Virginia 2010 Integrated Water Quality Monitoring and Assessment Report, list page 61.[3] Indeed, the Corps admitted that fact in its own decision document, but then inexplicably ignored its significance.  CDD, p. 91 ("WVDEP has indicated Dingess Run is listed on the 303(d) list"). WVDEP based its 303(d) listing on a September 2005 benthic sample in Dingess Run that produced a West Virginia Stream Condition Index (WVSCI) score of 33.62.  Pl. Ex. 22. WVDEP classifies a stream with that score as in "poor" biological condition.  CDD, p. 27.  To achieve a "good" rating, the WVSCI score must be at least 68, more than double what WVDEP measured.  <u>Id.</u>[4]  If the WVSCI score is below 60.6, the stream is considered biologically impaired, which means that it does not meet West Virginia's narrative water quality standard for the protection of aquatic life.  Doc. #30-10, p. 14.  Scores between 60.6 and 68 are in a "gray

_____

[3] The full document is available at http://www.dep.wv.gov/WWE/watershed/IR/Documents/IR_ 2010_Documents/2010IR_EPA_Approved_Full_Version.pdf.

[4] Once a stream is on the 303(d) list, the CWA requires WVDEP to develop a Total Maximum Daily Load (TMDL) for that stream.  <u>San Francisco BayKeeper v. Whitman</u>, 297 F.3d 877, 880 (9th Cir. 2002).  A TMDL is "the maximum quantity of a pollutant the water body can receive on a daily basis without violating the water quality standard."  <u>Id.</u>  By definition, a TMDL requires a <u>cumulative</u> impact analysis, because "TMDL calculations are to ensure that the cumulative impacts of multiple point source discharges and nonpoint source pollution are accounted for." <u>Id.</u>  Thus, a 303(d) listing necessarily means that the cumulative impacts of mining in the watershed are already significant and need to be reduced.  WVDEP has not yet established a TMDL for Dingess Run to address its impairment.

zone" where adverse impact to biological integrity is less than certain.  Id.

Thus, the Corps assumed that Dingess Run was in "good" biological condition (see, e.g., CDD, p. 84), when in fact WVDEP found that it is in "poor" biological condition.[5]  This gross factual error nullifies the Corps' finding of cumulative insignificance, because it shows that the Dingess Run watershed is not "absorbing the impacts without significant aquatic impairment and/or degradation."  CDD, p. 83.  The Corps' finding on this issue is therefore arbitrary and capricious.

> **2.      The Corps' Finding of Cumulative Insignificance Is Arbitrary and Capricious Because Freeze Fork, a Tributary in the Cumulative Impact Area, Is Already Biologically Impaired and Exceeds Water Quality Standards**

The Corps' error is not limited to this measurement of biological impairment in the main stem of Dingess Run.  Highland's Freeze Fork surface mine is adjacent to the Reylas mine site and discharges into Freeze Fork, a tributary which flows into Dingess Run.  CDD, p. 2 ("[t]here is an active surface mine adjacent to the proposed project area on Freeze Fork"); id., p. 77 ("Dingess Run and its tributaries (Freeze Fork . . .)").  The Corps specifically included the Freeze Fork mine in its cumulative impact analysis for the Reylas mine.  CDD, pp. 77, 105.  In that analysis for the Dingess Run watershed, the Corps claimed that "water quality associated with streams in this watershed has not been impacted to a level of significance."  CDD, p. 78.

In fact, however, Highland measured the benthic community at three locations in Freeze Fork and found that all three of those locations had WVSCI scores below the 68-point threshold for an unimpaired stream.  Doc. #30-4, p. 238.  The three scores were 52.10 (site FF-2), 59.05

---

[5] It is ironic that the Corps ignored WVDEP's 303(d) listing, because the Corps states that "[i]nterpretation and enforcement of water quality and NPDES standards are uniquely a state issue."  CDD, p. 88.

(FF-3), and 64.52 (FF-4).  Id.  Those measurements were taken in 2008 after four years of

mining operations, and all three locations are downstream of valley fills.  Id. at p. 232, 234 (map

showing locations of FF-2, FF-3 and FF-4).  These scores are indicative of "fair" and impaired

water quality, not "good" water quality.  Id. at 238.  Thus, water quality in Freeze Fork, a

tributary in the Dingess Run watershed, has been reduced from "good" to impaired, which is a

significant change.  The Corps' finding on this issue is therefore also arbitrary and capricious.

> **3.    The Corps' Finding of Cumulative Insignificance Is Arbitrary and
> Capricious Because Selenium Levels in Dingess Run and Its
> Tributaries, Including Freeze Fork and Reylas Fork, Already Exceed
> Water Quality Standards**

The Corps stated that selenium is "non-compliant at the threshold sampling site at the

confluence of Dingess Run and the Guyandotte River."  CDD, p. 75.  In fact, Highland measured

7 ug/l of selenium at the mouth of Dingess Run.  Tab 54, July 2009 Revised Permit Application,

pdf page 145, J-52.36.  West Virginia's chronic water quality standard for selenium is 5 ug/l.  47

CSR § 2, Appendix E, Table 1.  In other words, at the furthest downstream point in the Dingess

Run watershed, the water contains so much selenium that it already exceeds the state water

quality standard.  This measurement represents the cumulative downstream impact at that point

of all upstream selenium discharges in that watershed.  The Corps' statement on this point is an

implicit admission that the selenium-related impacts of past and existing mines in the Dingess

Run watershed are cumulatively significant.  An exceedance of the selenium water quality

standard by the collective, combined, upstream mining activities in that watershed is proof of

cumulatively significant water quality degradation.

The Corps tried to finesse this admission by reframing and limiting the issue to the

incremental addition of selenium by Highland's mine:

> Water quality associated with this watershed has not been adversely impacted by these

8

[mining] activities, with the exception of slightly elevated selenium levels. According to analysis conducted as a part of the WVDEP SMCRA permit, it is not expected the proposed action would contribute to elevated selenium levels due to the geochemical composition of the rock/coal within the SMCRA permitted area.

CDD, p. 75 (emphasis added). Similarly, the Corps stated a few pages later that "[s]everal streams have exhibited elevated selenium levels" but "[s]elenium is not expected to be a problem with the proposed surface mine." Id. at 80. Thus, the Corps' theory is that selenium impacts are cumulatively insignificant because Highland's incremental selenium impacts are insignificant, even though cumulative selenium impacts are "elevated."

The Corps' theory is erroneous as a matter of law. "Cumulative impacts" are impacts on the environment resulting from the "incremental impact of the action when added to other past, present, and reasonably foreseeable future actions." 40 C.F.R. § 1508.7 (emphasis added). "It is the *additive* effect of both agency and other actions taken together that constitutes the gravamen of appropriate cumulative impacts analysis under NEPA." Mountaineers v. U.S. Forest Serv., 445 F. Supp. 2d 1235, 1248 (W.D. Wash. 2006) (emphasis in original). It is therefore arbitrary and capricious when an agency's "cumulative impacts analysis only fully accounts for the incremental environmental effect" of the proposed action. Id. at 1247. See also Grand Canyon Trust v. F.A.A., 290 F.3d 339, 342 (D.C. Cir. 2002) ("the agency's EA must give a realistic evaluation of the total impacts and cannot isolate a proposed project, viewing it in a vacuum"). Similarly, under the CWA's 404(b)(1) Guidelines, "[c]umulative impacts are the changes in an aquatic ecosystem that are attributable to the collective effect of a number of individual discharges." 40 C.F.R. § 230.11(g) (emphasis in original). A discharge cannot be permitted if it "contributes to" cumulatively significant degradation. Id., § 230.10(c). Thus, under both NEPA and the CWA, the cumulative effect is the additive effect, not the incremental effect.

Besides this in-stream Dingess Run selenium measurement, there is additional

compelling evidence that the cumulative selenium levels in the Dingess Run watershed are already significant.  However, the Corps misrepresented that evidence.  As noted above, the Corps stated that selenium is "non-compliant" and "elevated," but then claimed that "water quality associated with streams in this watershed has not been impacted to a level of significance."  CDD, pp. 75, 78.  In addition, the Corps stated that "the applicant has mined similar seams at adjacent permits (S-5030-96 and S-5001-94) and the effluent from these sites has historically been maintained within approved NPDES limits" and that "they have experienced no excursions associated with selenium."  CDD, p. 22.  As we show below, these Corps statements about insignificant water quality impacts and the absence of selenium excursions are arbitrary and capricious.

The S-5030-96 permit referenced by the Corps is Highland's Freeze Fork mine.  This mine is immediately adjacent and to the east of the Reylas mine.  Tab 55, Map.  The NPDES permit for the Freeze Fork mine requires selenium monitoring at two outlets that discharge into Freeze Fork—Outlets 001 and 019—and at an in-stream point downstream from those outlets—Point DFF (Downstream Freeze Fork).  Pl. Ex. 23.  The permit does not impose any selenium effluent limits at these outlets.  Id.  Thus, the Corps' and Highland's claimed absence of selenium "excursions" is misleading, because the current permit does not set any numeric limits that can be exceeded at those outlets.  However, Highland's reported monitoring data in its Discharge Monitoring Reports show that the selenium levels measured at in-stream point DFF downstream from these two outlets has frequently and repeatedly exceeded both the 5 ug/l chronic water quality standard and the 20 ug/l acute water quality standard.  47 C.S.R. § 1, Appendix E, Table 1, 8.27; CDD, p. 32, Table 17 (recommended selenium level is <0.005 mg/l).  The DMR data for in-stream point DFF is attached as Pl. Ex. 24 and is summarized in the table

below:



Thus, according to Highland's own monitoring data, the in-stream selenium concentration in

Freeze Fork downstream from Highland's outlets is often more than double the chronic selenium

standard.  In addition, in 2006, sampling at the mouth of Freeze Fork showed selenium at 14

ug/l, which is nearly three times higher than the chronic standard.  Tab 54, July 2009 Revised

Permit Application, pdf page 127, J-52.18.  Therefore, the Corps' contrary finding that "water

quality associated with streams in this watershed has not been impacted to a level of

significance" is arbitrary and capricious.

In addition to Freeze Fork, Reylas Fork (where Highland's mine will be located) also has

selenium levels that already exceed water quality standards.  Highland measured 9 ug/l of

selenium at stream point HW-5, which is at the base of the proposed Valley Fill No. 1.  Highland

also measured 7 ug/l at stream point HW-7 and 6 ug/l at stream point HW-8, which are both

beneath the footprint of the proposed Valley Fill No. 1.  Doc. #30-12, Tab 8.E (mine drainage

map with sampling points), and Tab 8.G, pp. J-52.10, J-52.14, J-52.16.  Thus, the water quality

at the Reylas mine site itself already exceeds the chronic selenium standard.

In light of this extensive evidence of existing selenium levels in excess of water quality

standards at the mouth of Dingess Run, in Freeze Fork immediately adjacent to Highland's mine

site, and even at the mine site itself, the Corps' finding of cumulatively insignificant impacts

regarding selenium is arbitrary and capricious.

> **4.     The Corps' Claim That Highland's Mine Would Not Make the
>          Existing Biological Impairment and Selenium Non-Compliance Worse
>          Is Arbitrary and Capricious**

The Corps also had no rational basis for concluding that Highland's new mine will not

make the existing situation incrementally worse.  CDD, p. 84 ("this proposal will not result in a

cumulatively significant incremental impact to the watershed").  As we have shown above,

cumulative significance is measured additively based on the impacts of all mining activities in

the watershed, not just Highland's new incremental contribution to those impacts.  The existing

effects are already cumulatively significant, because they already cause biological impairment

and selenium non-compliance that exceed water quality standards.  As a result, any additional

pollution contributed by Highland's Reylas mine that could potentially worsen an already

significant cumulative impact is also significant, even if that mine's pollution, if measured in

isolation, is minor or insignificant.[6]  40 C.F.R. §§ 1508.27, 230.10(c), 230.11(g)(1); Grand

Canyon Trust, 290 F.3d at 343 (quoting Hanly v. Kleindienst, 471 F.2d 823, 831 (2d Cir. 1972))

---

[6] Plaintiffs contend that Highland's contribution of conductivity will be individually, as well as
cumulatively, significant.  However, the amount of that individual contribution is a disputed
factual issue that will be resolved, if necessary, by expert testimony at trial.

("even a slight increase in adverse conditions that form an existing environmental milieu may sometimes threaten harm that is significant").

### i.     The Mine Will Potentially Contribute Additional Conductivity

It is indisputable that the Reylas mine will potentially contribute additional conductivity, which is a measure of the presence of ions that are a source of biological impairment.  The Corps acknowledged that "[t]he placement of rock fill and overburden material into the stream channels would potentially result in increases in sedimentation, acidic drainage, specific conductivity, metal levels and total and dissolved solids."  CDD, p. 67.  See also id. ("it is expected run-off from the construction area could cause slight increases in specific conductivity"); Doc. #30-12, Tab 8, p. J-22 ("some increase in conductivity can be expected"); CDD, p. 89 (there is a "possibility that the valley fill would probably result in increased conductivity").  The Corps admits that one of the on-site "mitigation" channels will contain elevated levels of conductivity. Channel 1 will be supplied with deep mine discharge water containing up to 1200 µs/cm of conductivity.  CDD, p. 38; CDD, p. 7 ("two post-SMCRA deep mines exist at the site, . . . one of which is discharging water at the site . . . [with] elevated . . . conductivity levels"); Tab 57, p. 136.  In contrast, existing streams at the impact sites all have much lower conductivity, between 70 and 863.  CDD, pp. 33, 42.  According to Highland's own predictive analysis, discharges of similar deep mine water at a nearby mine site have caused stream impairment, with three of four WVSCI scores below 68.  Tab 57, p. 137.  As a result, as EPA has warned, "these constructed channels even after reclamation will not provide clean, freshwater dilution to the watershed, which is so essential to the overall health of those receiving waters."  Doc. #30-1, Tab 46, p. 4. Instead, the "mitigation" channels will actually pollute those waters with increased conductivity.

There are no limits on conductivity in Highland's NPDES permit, SMCRA permit, or

404 permit, and Highland refused to accept any such limits.  Tab 81, p. 4 (Highland "declines to implement a[] self-imposed limit for conductivity"); CDD, p. 92.  The Corps therefore had no rational basis to conclude that Highland's Mine would not contribute additional conductivity and potentially worsen the existing biological impairment in the Dingess Run watershed.

### ii.      The Mine Will Potentially Contribute Additional Selenium

It is also indisputable that the Reylas Mine will potentially contribute additional amounts of selenium to the Dingess Run watershed.  WVDEP found that the mine's discharges had a reasonable potential to cause or contribute to violations of the selenium water quality standard. Docket #30-13, 12/18/06 Permit Rationale Page for WVNPDES Permit No. WV1022971 ("Due to the BWQ [Baseline Water Quality] showing hits on selenium the limit 4.7-8.2 ug/l will be applied.").  Because of this finding, WVDEP was compelled by federal regulations to impose limits on selenium discharges in the mine's NPDES permit.  40 C.F.R. § 122.44(d)(1)(i). Highland has no plans to install a treatment system to control its selenium discharges.  Even if it did, compliance with those permit limits would not necessarily eliminate a selenium contribution to the cumulative amount in the Dingess Run watershed.  From a cumulative impact perspective, even a compliant discharge could add some selenium and therefore make an existing bad selenium situation worse, or prevent it from improving to the point where streams in the watershed have levels below 5 ug/l.  For example, one of the mine's to-be-impacted tributaries is presently contributing low-selenium dilution water with less than 2 ug/l of selenium to Dingess Run, but under its NPDES permit Highland could increase that level to an average of 5 ug/l without violating its permit limits.  Tab 8.g, p. J-52.6, pdf page 103.

Furthermore, as a matter of law, Highland's potential contribution of additional conductivity and selenium must be considered cumulatively significant.  EPA regulations under

the CWA prohibit the issuance of an NPDES permit for a new source that would discharge any additional amounts of a pollutant to a watershed that is already impaired for that pollutant unless commitments for offsetting reductions are first obtained from existing sources.  40 C.F.R. § 122.4(i); see Friends of Pinto Creek v. EPA, 504 F.3d 1007, 1012 (9th Cir. 2007).  Dingess Run is already biologically impaired and non-compliant for selenium.  Highland's additional potential contribution threatens to violate § 122.41(i).  The NEPA regulations define significance as a function of several factors, including "[w]hether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment."  40 C.F.R. § 1508.27(b)(10).  Highland's permit, together with other mining discharges, creates such a threat and therefore those actions are cumulatively significant as a matter of law.

### B. The Corps' Reliance on Compensatory Mitigation for its Determination That the Mine Will Not Cause Significant Degradation Under the CWA or Significant Impacts Under NEPA Is Arbitrary and Capricious

The Corps determined that Highland's project would not cause significant degradation under the CWA or significant impacts under NEPA because the harm caused by filling streams would be offset by mitigation.  "[T]he USACE has determined the compensatory mitigation plan, if implemented correctly, would adequately off-set the permanent loss of aquatic resources associated with the proposal and help maintain the biological, chemical, and physical integrity of waters of the U.S."  CDD, pp. 90-91.

This determination of individual, as opposed to cumulative, insignificance is arbitrary and capricious for four reasons. First, the Corps' determination is not supported by any evidence that the type of on-site stream creation proposed by Highland in its mitigation plan is likely to succeed.  In fact, all the evidence is to the contrary.  The U.S. Fish and Wildlife Service (FWS) "indicated the successful creation of streams using drainage control structures has yet to be

15

demonstrated in West Virginia."  CDD, p. 84.  EPA similarly commented that these structure are

"likely inadequate to fully compensate for lost functions of the aquatic ecosystem" and their

success "has not been demonstrated."  CDD, p. 90; Doc. #30-1, Tab 46, p. 4.  More recently, in

its January 2011 Spruce No. 1 veto decision, EPA stated that there is "no evidence in the peer-

reviewed literature" that stream creation using on-site drainage control structures works.  Doc.

#30-2, Veto, p. 85.  EPA found that it is "extremely unlikely" that these structures will be

effective mitigation for the loss of high-value streams.  Id. at 86.

      Second, the Corps did not disagree with this assessment by FWS or EPA.  It found that

Highland's mitigation plan would not completely offset all lost functions of the buried streams.

The Corps "is not guaranteeing or predicting the mitigation stream channels would replace all

functions and values lost as a result of the filling of stream channels associated with this

proposal."  CDD, p. 90.  The Corps predicted only that "the proposed mitigation should replace

the majority of the stream functions lost as a result of the proposal."  CDD, pp. 96-97 (emphasis

added); see also id. at 73 (mitigation plan is expected "to replace the majority of the lost stream

functions resulting from the proposal").[7]  Thus, the Corps did not claim 100% mitigation

success, but only something greater than 50%.  This obviously leaves a huge remainder of

unmitigated impacts.  In the CDD, the Corps did not explain why those remaining impacts are

insignificant.

---

[7] Significantly, in its February 2012 decision reissuing Nationwide Permit 21 for surface coal
mining, the Corps expressly rejected stream creation as a viable mitigation measure, stating that
"the Corps is not relying on stream creation as a mechanism to provide compensatory mitigation
for NWP 21 activities."  Final Notice, Reissuance of Nationwide Permits, 77 Fed. Reg. ___ (Feb.
21, 2012), prepublication version, p. 47, available at http://www.usace.army.mil/Portals/2/docs/
civilworks/nwp/NWP2012_prepublicationfinal_3feb2012.pdf .  If the Corps does not believe that
stream mitigation can work for surface coal mining activities permitted under NWP 21, then it
cannot rationally claim that it will work for the same activities permitted under an individual
permit.

Third, instead of offering such an explanation, the Corps relied on an impermissibly vague backup "Plan B" in the event of mitigation failure.  This plan amounts to nothing more than a general promise to comply with the law, and fails to contain the specific evaluation of mitigation success needed to support the Corps' determination of insignificance.  "Because the USACE cannot guarantee 100% success of the stream creation mitigation, the applicant has proposed contingency and remedial plans for the segment of the compensatory mitigation in case the stream creation does not fulfill the performance goals."  CDD, p. 52.  The Corps describes Plan B as follows:

> If annual performance criteria are not met for any portion of the mitigation sites for two consecutive reporting periods, the mitigation sites are not developing as indicated in the CMP, or at the end of the monitoring period the final success criteria cannot be met, the applicant, in consultation with the USACE, would implement contingency and/or remedial measures, if necessary, which would include re-design of the mitigation plan, submittal of in-lieu fees, mitigation banking, and preservation of high quality stream habitat and buffer.

Id. at 53.  Thus, if mitigation fails, the Corps assumes that some unspecified combination of additional measures in the future can bridge the gap and guarantee that the actual impacts caused by filling the stream would be rendered insignificant.

The problem with Plan B is it simply kicks the can down the road and substitutes a future regulatory process for the Corps' present duty to evaluate the likelihood of success of the overall mitigation plan.  The Corps' regulations provide that "[w]hen evaluating compensatory mitigation options, the district engineer will consider what would be environmentally preferable.  In making this determination, the district engineer must assess the likelihood for ecological success . . ."  33 C.F.R. § 323.3(a).  Instead, the Corps here is merely saying that if Plan A (which has only a 50+% chance of success) fails, we will do Plan B.  But the Corps never evaluates the likelihood that Plan B will succeed.  Nor does it identify any specific mitigation

17

measures in Plan B that have a higher likelihood of success than those in Plan A.   Plan B is therefore reduced to nothing more than a promise to comply with the law.

This Court has experience with this situation.  In promulgating Nationwide Permit 21 for coal mining fill impact, the Corps similarly "relied on a review *process* that would identify necessary and appropriate mitigation measures at a later time and on a case-by-case basis." OVEC v. Hurst, 604 F. Supp. 2d 860, 889 (S.D. W. Va. 2009) (emphasis in original).  Judge Goodwin held that the Corps' reliance on this process was arbitrary and capricious because it "has not provided any evidence that its proposed mitigation process would be successful" or "adequately policed" through monitoring programs.  Id. at 891.  The Corps "failed to provide any explanation for *why* it believes mitigation imposed through the case-by-case review of NWP 21 (2007) activities will work to mitigate the permit's cumulative impacts to a minimal level."  Id. at 892.  Judge Goodwin also extensively reviewed the General Conditions in the NWPs and found that they merely provided "a list of options with little guidance on how they should be selected or applied," and "loose instructions" lacking any "guarantee of successful mitigation." Id. at 892-93.  The Court found itself "left with nothing but the Corps' unsupported belief" in successful mitigation–a belief that was "rendered even less convincing by the Corps' concession that mitigation plans sometimes fail."  Id. at 894.

Those same conclusions apply here.  The Corps' discussion of future mitigation options under Plan B is just as vague as the Corps' plans for NWP 21.  It says that if Highland's mitigation plan fails it "would implement contingency and/or remedial measures, if necessary, which would include re-design of the mitigation plan, submittal of in-lieu fees, mitigation banking, and preservation of high quality stream habitat and buffer."  CDD, pp. 53, 92-93.  As in the NWP 21 case, this is just a laundry "list of options with no guidance on how they will be

18

selected or applied."  604 F. Supp. 2d at 892-98.  The Corps also provides no explanation or

supporting evidence on the likelihood that Plan B itself will succeed.  As a result, the Corps'

decision to rely on future compensatory mitigation to achieve insignificant effects is merely a

conclusory, unsupported presumption.  Both this Court and the Fifth Circuit have held that the

Corps cannot simply presume that compensatory mitigation will eliminate significant adverse

effects.  OVEC, 604 F. Supp. 2d at 886 n. 21; O'Reilly v. U.S. Army Corps of Engineers, 477

F.3d 225, 235 (5th Cir. 2007).  The Corps has made nothing more than a promise to comply with

the law, which is insufficient to comply with the CWA or NEPA.  OVEC, 604 F. Supp. 2d at

872, n.7.

Furthermore, the Corps' "act first, analyze-it-later approach" is inconsistent with the

basic purpose of NEPA.  "NEPA procedures must insure that environmental information is

available to public officials and citizens before decisions are made and before actions are taken."

40 C.F.R. § 1500.1(b).  "NEPA's effectiveness depends entirely on involving environmental

considerations in the initial decisionmaking process."  Metcalf v. Daley, 214 F.3d 1135, 1145

(9th Cir. 2000).  Thus, NEPA requires federal agencies to analyze and plan for environmental

consequences before they act, not after the damage is done.  The Corps' approach turns NEPA

on its head.

Fourth, the Corps' mitigation plan does not fully mitigate for the harm that will occur

between the time the existing streams are buried and the time the as-now-unbuilt drainage

control structures are supposed to replace them.  According to the Corps, it will take at least ten

years before stream creation sites become fully functional.  CDD, p. 41 ("full maturity . . . may

take longer than ten years"); id., p. 44 (created streams would become "moderately functional"

ten years after construction"); id., p. 45 ("created streams are not expected to obtain the highly

functional status within 10 years after construction"). Thus, during these ten years, stream losses would not be offset by mitigation.

To address this problem, the Corps stated that this "temporal loss would be offset through the creation of approximately 15% of additional stream channel as the lag time would be approximately five years." Id. at 40. This analysis is irrational for two reasons. First, the Corps' own statements show that the temporal loss is at least ten years, not five, so by the Corps' own reasoning the 15% figure does not compensate for the full temporal delay. Second, the Corps has provided no factual or evidentiary basis for its choice of 15% as a sufficient coefficient for temporal loss. It simply pulled that figure out of thin air.

Thus, the Corps' conclusion that compensatory mitigation will prevent significant impacts is arbitrary and capricious because the Corps has no rational basis for concluding that on-site stream creation is likely to succeed, does not have a specific, viable plan to address mitigation failure, and did not fully account for the long temporal delay before mitigation offsets occur.

**C.    The Corps' Reliance on a Mitigation Plan That Was Unavailable For Public Comment Violates the Public Notice and Participation Requirements of the CWA and NEPA**

The Corps failed to comply with its duties under the CWA and NEPA to provide adequate public notice, a meaningful opportunity for public comment, and other public involvement in its review process for Highland's § 404 permit. The cornerstone of the Corps' decision is a 2009 comprehensive mitigation plan (CMP) that was not available during the 2008 public comment period. By failing to provide for public input and comment on the document that is critical to the permit's issuance, the Corps shut out the public from meaningful

involvement in the process.

Under the CWA, the Corps' regulations provide that a public notice is not adequate unless it contains "sufficient information to give a clear understanding of the nature and magnitude of the activity to generate meaningful comment." 33 C.F.R. § 325.3(a). NEPA regulations similarly provide that environmental information must be made available to the public before decisions are made and that agencies must involve the public, to the extent practicable, in preparing their environmental analyses. 40 C.F.R. §§ 1500.1(b), 1501.4(b).

The Corps' approach to public participation in this case shares many of the same defects that this Court identified in OVEC v. U.S. Army Corps of Engineers, 674 F. Supp. 2d 783 (S.D. W. Va. 2009). In that case, this Court granted summary judgment to the plaintiffs, holding that the Corps violated the public notice requirement under the CWA and the public participation requirement under NEPA. The Court noted that meaningful public dissemination of mitigation information is critical, since mitigation plans are a central component of § 404 permits. Id. at 803-804. "Compensatory mitigation is the single most important material issue related to the justification of such a permit." Id. at 804. Because of the importance of mitigation, the Court held that the Corps must release as much mitigation data as practicable. Id. at 811. The Court therefore concluded that the absence of mitigation information during the public comment period violated the CWA regulations and NEPA. Id. at 813-18.

Similarly, in the present case, the Corps failed to include crucial mitigation information during the public comment period. In its final decision document, the Corps relied on a July 2009 version of the CMP. CDD, pp. 24, 53. That document was not available during the public comment period, which closed over a year earlier on April 27, 2008. CDD, p. 10. At that time, only Highland's preliminary CMP was available. Tab 17.

The final 2009 CMP was significantly different from the preliminary 2008 CMP in size, detail and content.  The original CMP "included approximately 35,980 feet of stream creation" while the 2009 revision "decreased the amount of stream creation to 28,960 feet."  CDD, p. 85. The preliminary CMP contained 58 pages of text and 40 pages of appendices, while the final CMP contained 158 pages of text and 54 pages of appendices.  Compare Tabs 17, 58.  The Corps crossed out all of the tables in the 2008 CMP that summarized the stream mitigation because it was no longer accurate.  Tab 17, pp. 16, 24, 30, 38.  The entire stream enhancement plan was deleted.  CDD, p. 85.  Highland's stream consultant criticized EPA's comments on the project as uninformed because it relied on the earlier CMP.  After the final CMP was submitted in August 2009, he told the Corps that "I just don't understand how they [EPA] can raise all the stink with this project if they haven't even looked at all the material we submitted."  Doc. #30-11, Tab 67, p. 1.  The Corps relied on the changes in the 2009 CMP in concluding that the mitigation plan offsets the stream losses from the mine.  CDD, p. 53.  It was clearly feasible for the Corps to circulate the 2009 CMP to the public, since it circulated that document to state agencies.  Id. at 90 ("The July 2009 CMP has been thoroughly reviewed by this office and the state resource agencies . . .").

Thus, for the same reasons that this Court enunciated in OVEC, the Corps has again violated the public notice requirement in the CWA and the public participation requirement in NEPA.

**II.**     **The Court Should Remand the Permit, Require a New Public Comment Period, and Enjoin Any Permit Activities**

The Corps' refusal to prepare an environmental impact statement is arbitrary and capricious "if its action might have a significant environmental impact."  State of N.C. v. FAA, 957 F.2d at 1131 (emphasis added).  The administrative record here shows that Highland's

project might have a cumulatively significant impact, and that the Corps' FONSI is arbitrary and capricious.  Plaintiffs therefore request that this Court issue a remand order like the one that it entered in OVEC v. U.S. Army Corps of Engineers, 479 F. Supp. 2d 607 (S.D. W. Va. 2007), rev'd on other grounds, 556 F.3d 177 (4th Cir. 2009).  In that case, the Court held that when the Corps issues an Environmental Assessment under NEPA that does not adequately address environmental effects of mining and a decision document under the CWA that does not comply with the 404(b)(1) Guidelines, the permit should be remanded to the Corps for reconsideration. Id. at 662-63.

In addition, Plaintiffs request that the Court require a new public notice and opportunity for public comment on remand.  A new public comment period is necessary so that the public can review and comment on the final version of the mitigation plan.  It is also necessary because, as we have shown above, the Corps made such serious factual errors in evaluating water quality and mitigation issues.  The public should have the opportunity to present evidence refuting those errors.

Pending the Corps remand and reconsideration, Plaintiffs request that the Court enjoin Highland from conducting any further activities that were authorized under the permit.  The Court has issued similar injunctions in several of its prior decisions on Corps 404 permits.  See, e.g., Bragg v. Robertson, 54 F. Supp. 2d 635, 653 (S.D. W. Va. 1999) (granting preliminary injunction); OVEC v. U.S. Army Corps of Eng'rs, 528 F. Supp. 2d 625, 631-34 (S.D. W. Va. 2007) (granting preliminary injunction); OVEC v. Hurst, 604 F. Supp. 2d 860, 903 (S.D. W. Va. 2009) (granting permanent injunction).

Equitable principles support the issuance of injunctive relief.  "[T]here is no adequate remedy at law to compensate the public for the harm caused by the disposal of fill material into

23

waters of the United States or in wetlands." U.S. v. Malibu Beach, Inc., 711 F. Supp. 1301, 1313

(D.N.J. 1989). The destruction of streams and aquatic habitat by valley fills is imminent,

permanent and irreparable. When environmental injury "is sufficiently likely . . . the balance of

harms will usually favor the issuance of an injunction to protect the environment." Amoco

Production Co. v. Village of Gambel, 480 U.S. 531, 545 (1987). Plaintiffs' members have

environmental, recreational, and aesthetic interests in the protection of West Virginia's streams,

and those interests are irreparably harmed by their destruction. Bragg, 54 F. Supp. 2d at 645-46.[8]

The harm to Plaintiffs greatly outweighs the harm to the Corps and Highland from the delay and

additional processing time caused by the remand of the permit for reconsideration. Alaska

Center for the Environment v. West, 31 F. Supp. 2d 714, 723 (D. Alaska 1998). "The economic

loss to the [operator] from cessation of [filling] activities is far outweighed by the benefit to the

community from the enjoining of activities adversely affecting the environment." U.S. v.

Ciampitti, 583 F. Supp. 483, 499 (D.N.J. 1984). In addition, "[i]t is axiomatic that the public

interest under the Clean Water Act requires strict enforcement of the statute so as to clean up the

---

[8] Plaintiffs have submitted declarations from two of their members to support their standing to sue. Kenny King lives about a mile from Highland's Reylas Mine and has frequently used the Dingess Run watershed, including Bandmill Hollow, for wildlife observation and plant collection. Doc. #47-6. Cindy Rank also frequently visits, observes and enjoys the Dingess Run watershed. Doc. #47-5. Their aesthetic enjoyment of that watershed and its associated aquatic life, including fish and waterfowl, is harmed by Highland's proposed mine and valley fill. Id. Dingess Run is already biologically impaired by discharges from mine sites. CDD, p. 91. The Corps has acknowledged that Highland's mine creates a risk of further impairment due to increased conductivity. CDD, p. 61. In its January 11 decision vetoing a similar permit for the Spruce No. 1 Mine, EPA found that valley fills are strongly associated with increased conductivity in downstream waters, which then suffer from impaired macroinvertebrate and salamander communities, food web changes, increased risk of harmful algal blooms, and adverse effects on amphibians, reptiles, crayfish, and bird species that depend on downstream waters for food or habitat. Doc. #30-2, EPA Spruce Veto, p. 73. Consequently, Plaintiffs have members who are suffering threatened harm to their aesthetic and environmental interests, and that harm is traceable to Highland's mine and could be redressed by remanding Highland's permit and enjoining activities thereunder, as Plaintiffs request.

nation's waters and preserve the surrounding ecological environment."  Id.

## Conclusion

For these reasons, the Court should (1) issue a declaratory judgment that the Corps'

March 2011 and September 2011 decisions issuing and reinstating a § 404 permit for Highland's

Reylas Surface Mine violate the CWA and NEPA, and that that permit may have significant

impacts requiring that a supplemental EA or EIS be prepared, (2) vacate the permit or remand

the permit to the Corps for reconsideration to remedy those violations, and (3) issue a permanent

injunction enjoining Highland from conducting any activities authorized under that permit.

DATED:  February 17, 2012                Respectfully submitted,

s/ James M. Hecker
JAMES M. HECKER
Public Justice
1825 K Street, N.W. Suite 200
Washington, DC 20006
(202) 797-8600
JOSEPH M. LOVETT
DEREK O. TEANEY
Appalachian Mountain Advocates
P.O. Box 507
Lewisburg, WV 24901
(304) 645-9006

Counsel for Plaintiffs