**IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

OHIO VALLEY ENVIRONMENTAL
COALITION, INC., et al.,

                Plaintiffs,

v.                                  CIVIL ACTION NO. 3:11-0149

UNITED STATES ARMY CORPS
OF ENGINEERS, et al.,

                Defendants.

**MEMORANDUM OPINION AND ORDER**

Plaintiffs [1] challenge the decision by the United States Army Corps of Engineers (hereinafter "Army Corps" or simply "the Corps") to issue an individual Clean Water Act ("CWA") § 404 permit to Highland Mining Company ("Highland") to discharge fill material into streams for the purpose of conducting surface coal mining activities at the Reylas Surface Mine located in Logan County, West Virginia.   In April 2011, this Court granted the Corps' motion to remand the permit to the agency for reconsideration.   In September 2011, the Corps reinstated the permit, and this litigation resumed.   As a result of actions by the Corps during the remand, Plaintiffs have withdrawn Counts Two and Three of their Second Amended Complaint.   At this time, only Counts One and Four remain for resolution by the Court.   All parties have filed

---

[1] Plaintiffs are the environmental groups Ohio Valley Environmental Coalition, Inc., West Virginia Highlands Conservancy, Sierra Club, and Coal River Mountain Watch, Inc.

cross-motions for summary judgment on the remaining counts, and the Court granted partial summary judgment for the Corps in a short order on May 1, 2012.  *Order*, ECF No. 156.  The rationale for that decision is set forth herein.  The remainder of the cross-motions were held in abeyance in order to conduct an evidentiary hearing, and this case is now ripe for decision.  For the reasons set forth below, the United States Cross-Motion for Summary Judgment (ECF No. 116) is **GRANTED**.  Intervenor-Defendant Highland Mining Company's Motion for Summary Judgment (ECF No. 96) is **GRANTED**.  Plaintiffs' Motion for Summary Judgment (ECF No. 94) is **DENIED**.  A separate judgment order will be entered along with this Memorandum Opinion and Order.

## Legal Background

### 1. Surface Mining Control and Reclamation Act

"The Surface Mining Control and Reclamation Act of 1977 ("SMCRA") was enacted to strike a balance between the nation's interests in protecting the environment from the adverse effects of surface coal mining and in assuring the coal supply essential to the nation's energy requirements."  *Bragg v. W. Va. Coal Ass'n*, 248 F.3d 275, 288 (4th Cir. 2001); 30 U.S.C. § 1202(f).  This is accomplished through "cooperative federalism" in which responsibility for regulation of surface mining is shared between the states and the United States Secretary of the Interior.  *Id*.  Unless a state is operating an approved program, SMCRA permits are issued by the Department of the Interior, Office of Surface Mining.  *See* 30 U.S.C. §§ 1253–1256.  West Virginia operates an approved program, and SMCRA permits are issued by the West Virginia Department of Environmental Protection.  Final Rule Approving West Virginia Proposed Permanent Regulatory Program Under The Surface Mining Control and Reclamation Act of 1977,

46 Fed. Reg. 5915 (Jan 21, 1981), *codified at* 30 C.F.R. § 948.1 *et seq*.

## 2. Clean Water Act

The CWA prohibits the unpermitted discharge of any pollutant into the navigable waters of the United States.   33 U.S.C. § 1311(a).   The CWA then creates two primary permitting regimes. The first is the National Pollutant Discharge Elimination System ("NPDES"), embodied in § 402 of the CWA.   33 U.S.C. § 1342.   The NPDES authorizes permits for the discharge of pollutants from point sources and imposes technology based water quality standards for the effluent.   33 U.S.C. § 1342.   The NPDES permit program, like SMCRA, uses cooperative federalism.   *Id*. at § 1342(b).   West Virginia has an approved program and NPDES permits are issued by the West Virginia Department of Environmental Protection ("WVDEP").   Section 404 creates the second category of CWA permits, which allow the placement of dredged or fill material into navigable waters.   33 U.S.C. § 1344.   Section 404 permits are issued by the Army Corps, not by the states. Coal mining activities requiring § 404 permits include the construction of valley fills, stream channel diversions, sediment ponds, road crossings, and disposal of coal mine waste.

Section 401 of the Clean Water Act requires that "any applicant for a Federal license or permit to conduct any activity . . . which may results in any discharge into the navigable waters, shall provide . . . a certification from the State in which the discharge originates . . . that any such discharge will comply with the applicable provisions of sections 1311, 1312, 1313, 1316, and 1317 of this title." 33 U.S.C. § 1341(a)(1).   In essence, the § 401 certification is a statement from the State that the discharge will not violate any effluent limitation established by the state and will not violate state water quality standards.   Because a § 404 permit is issued by the Army Corps, applicants must submit a § 401 certification to the Army Corps.

Individual § 404 permits are issued in compliance with guidelines issued by the Environmental Protection Agency ("EPA"), in consultation with the Army Corps, as required by CWA Section 404(b)(1).   33 U.S.C. § 1344(b)(1).   These regulations, commonly referred to as "404(b) Guidelines," are codified at 40 C.F.R. pt. 230.   The 404(b) Guidelines prohibit the Army Corps from issuing a permit if it will cause or contribute to violations of state water quality standards or to the significant degradation of waters of the United States.   40 C.F.R. § 230.10(b)(1), (c).   In addition to the prohibition on discharges which violate state water quality standards, the 404(b) Guidelines prohibit the discharge of dredged or fill material "unless appropriate and practicable steps have been taken which will minimize potential adverse impacts of the discharge on the aquatic ecosystem."   40 C.F.R. § 230.10(d).   To satisfy the 404(b) Guidelines, the Army Corps is required to make certain factual determinations and to issue findings of compliance or noncompliance.   40 C.F.R. §§ 230.11–12.   The Corps can reduce the potential adverse impacts associated with a permit by requiring compensatory mitigation as a condition of the permit.   *See* 40 C.F.R. § 230.12(a)(2) (compliance with 404(b) Guidelines conditioned on inclusion of appropriate and practicable conditions, including compensatory mitigation), 33 C.F.R. § 325.4(a)(3) (mitigation may be imposed as a condition of a permit); 33 C.F.R. § 320.4(r) (general statement of mitigation policy).   Subparts H and J of the 404(b) Guidelines describe actions to minimize adverse effects and compensatory mitigation policies. *See* 40 C.F.R. §§ 230.70–77, 230.91–98.

Compliance with the 404(b) Guidelines is required by the CWA, EPA regulations, and the Army Corps' own regulations.   33 U.S.C. § 1344(b)(1); 40 C.F.R. § 230.10; 33 C.F.R. §§ 320.4(a)(1); 325.2(a)(6).   The Corps' compliance with the 404(b) Guidelines is a central issue in

this case and is reserved for the Court's discussion of the merits of Plaintiffs' claims.   The parties also disagree as to the effect of 33 C.F.R. § 320.4(d) on this case.   That Army Corps regulation provides that a state § 401 certification "will be considered conclusive with respect to water quality considerations unless the Regional Administrator, Environmental Protection Agency (EPA) advises of other water quality aspects to be taken into consideration."   Because of its importance in the resolution of Plaintiffs' claims, this disputed issue is similarly reserved for the Court's discussion of the merits of Plaintiffs' claims.

### 3.  National Environmental Policy Act

The National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–4370(h) requires federal decisionmakers to take a "hard look" at the environmental consequences of major federal actions.   *Nat. Res. Def. Council, Inc. v. Morton*, 458 F.2d 827, 838 (D.C. Cir. 1972). Specifically, NEPA requires federal agencies to prepare an Environmental Impact Statement ("EIS") for any "major federal action significantly affecting the quality of the human environment."   42 U.S.C. § 4332(C).   Pursuant to regulations issued by the President's Council on Environmental Quality, the relevant governmental agency, in this case the Army Corps, determines whether or not an EIS must be prepared.   40 C.F.R. pt. 1501.   To determine if a particular action requires an EIS, the Army Corps may prepare an Environmental Assessment ("EA").   33 C.F.R. § 230.10; 40 C.F.R. § 1501.3.   If the Army Corps determines, on the basis of the EA, that a proposed project will not have a significant effect on the human environment, it then issues a "finding of no significant impact" ("FONSI").   33 C.F.R. § 230.11; 40 C.F.R. § 1501.4(e).

**Factual Background**

5

Surface coal mining operations recover horizontal seams of coal that are layered in mountains by removing the overburden above the seams to extract the coal. *Bragg*, 148 F.3d at 286; 30 U.S.C. § 1291(28). Federal law requires that the overburden be replaced to match the approximate original contour of the mountain. 30 U.S.C. §§ 1265(b)(3), 1291(2). However, once the overburden is taken from its natural state and broken up, it, "'swells', perhaps by as much as 15-25%." *Bragg*, 248 F.3d at 286. This excess overburden is disposed of in valley fills, often burying ephemeral, intermittent, and perennial streams near the mountaintop. *Id*. The valley fills themselves are constructed with diversions and underdrain systems to control erosion and runoff, and to ensure stability of the fill. Ordinarily, a sediment pond is constructed below a valley fill to collect the flow of water as it comes off of a valley fill. In West Virginia, the construction of the valley fill and the embankment to create the sediment pond both require a § 404 permit from the Army Corps. The water that is discharged from the sediment pond requires a § 402 NPDES permit from the WVDEP.

Highland submitted an application for a § 404 permit in September 2007, seeking authorization to discharge fill material in connection with a valley fill, sediment pond, and mine-through activities in Reylas Fork of Bandmill Hollow creek, a tributary of the Guyandotte River. The Reylas surface mine at issue in this case is located near Ethel, Logan County, West Virginia. *Application*, A.R. Tabs 3–12; A.R. Tab 104, at 3–4.[2] The Army Corps provided public notice of the permit application in March of 2008, which included information about the proposed

---

[2] Citations to "A.R." refer to the Administrative Record.

project and the mitigation plan.  *Public Notice*, A.R. Tab 18.[3]  The WVDEP issued a SMCRA permit and a NPDES permit for the project in January 2008, and a § 401 water quality certification in October, 2008.  A.R. Tab 104, at 1.

In March 2009, the Corps had thoroughly evaluated the Reylas proposal and expected to issue the permit without further delay.  *See* Meeting Notes, A.R. Tab 47, at ¶ 2.  At this point the EPA sent a letter to the Corps objecting to the issuance of the § 404 permit.  A.R. Tab 46. Specifically, the EPA stated that the proposed permit "is likely to cause or contribute to an excursion from the State's water quality standards downstream resulting in an impairment of the aquatic life use, and that the direct and cumulative impacts from this and future mines will be persistent and permanent and cannot be sufficiently or effectively compensated through the proposed mitigation."  *Id.* at 1.  In light of these water quality concerns, the letter explained that, "EPA believes that this project will result in significant impacts to the human environment requiring an environmental impact statement pursuance to Section 102 of the National Environmental Policy Act (NEPA)."  *Id.*  In a subsequent letter, the EPA submitted additional comments and expanded on its concerns over the alternatives analysis and mitigation requirements in the proposed permit, concluding that the permit could be issued with the addition of "appropriate permit conditions."  A.R. Tab 75.  After a period of interagency dialogue, reflected in the Administrative Record by e-mail conversations and meeting minutes, the Corps added some, but not all, of the additional permit conditions sought by the EPA.  As a result of these comments,

---

[3] Plaintiffs have withdrawn their claim, in Count Two of the Second Amended Complaint, that notice was inadequate under the CWA, NEPA and the APA.  *Pl.'s Mem. In Opp'n to Highland's Mot. for Summ. J.*, ECF No. 118, at 1.

the proposed permit was modified to eliminate approximately 400 feet of impacts to Reylas Fork and to reduce the amount of overburden to be place in the valley fill.   A.R. Tab 104, at 4.   On February 23, 2011, the Corps notified the EPA of its intention to proffer the permit.   A.R. Tab 97. The Corps then delayed that decision by one week at the request of the EPA.   A.R. Tab 100. During this time, the Corps, in consultation with the EPA, modified some of the special conditions of the permit for clarification.   A.R. Tab 102.   On March 4, 2011, the Corps proffered Highland's permit.   A.R. Tab 105.

Plaintiffs immediately challenged the permit in this Court.   *Compl.*, ECF No. 1. On April 20, 2011, the Court stayed these proceedings and granted the Corps' unopposed motion to remand the permit to the agency for further consideration.[4]   *Order*, ECF No. 38.   On September 13, 2011, the Corps reinstated the permit.   A.R. Tab 113.   After the reinstatement, Plaintiffs sought leave to file a supplemental complaint, which this Court denied, finding Plaintiffs' new claims to be futile because they were based on scientific studies first published after Highland's permit had issued. *Ohio Valley Envtl. Coal. v. U.S. Army Corps of Eng'rs*, 841 F. Supp. 2d 968 (S.D.W. Va. 2012). The parties then filed cross-motions for summary judgment, on which the Court heard argument on April 26, 2012.   At that hearing, it was agreed that Plaintiffs remaining claims could be classified as (1) challenges to the sufficiency of the Compensatory Mitigation Plan ("CMP"), and (2) challenges to the Corps' cumulative impact assessment under NEPA.   *Order*, ECF No. 156. The Court found the former claims to be controlled by *Ohio Valley Envtl. Coal. v. Aracoma Coal*

---

[4] During the stay and remand, the Corps issued a new public notice and considered the practicality of alternatives to reduce stream impacts.   As a result, Plaintiffs have withdrawn Counts Two and Three of their Second Amended Complaint.   *Pl.'s Mem. In Supp. of Their Mot. for Summ. J.*, ECF No. 100, at 2.

*Co.*, 556 F.3d 177 (4th Cir. 2009), and granted summary judgment in favor of the Corps on those claims.   The Court held the motions for summary judgment in abeyance with regard to the latter issues and held a four day evidentiary hearing from May 9–11, 2012.   At the conclusion of the hearing, the Court requested additional briefing on the conclusive effect of the WVDEP § 401 certification and, by agreement of the parties, postponed closing arguments until July 12, 2012. Having received the final briefs, heard closing argument, and considered all the evidence, this case is now ripe for resolution.

### Standard of Review

The Administrative Procedure Act, 5 U.S.C. §§ 701–706 ("APA"), supplies the standard of review in this case.   Under the APA, agency actions, findings, and conclusions can be set aside only if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."   5 U.S.C. § 706(2)(A).   Review under the APA is "highly deferential, with a presumption in favor of finding the agency action valid," though this deferential standard "does not reduce judicial review to a rubber-stamp of agency action."   *Aracoma*, 556 F.3d at 193.   To ensure that a federal agency has taken the "hard look" required by NEPA, the Court, "must engage in a searching and careful inquiry of the record," in order to determine "whether the agency considered the relevant factors and whether a clear error of judgment was made."   *Friends of Back Bay v. U.S. Army Corps of Eng'rs*, 681 F.3d 581, 587 (4th Cir. 2012) (internal citation and quotation omitted).   "Insofar as an agency's decision may be deemed to be unreasonable as a matter of law, it is likely to have been arbitrary and capricious."   *Id.* (citing *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 377 n. 23 (1989) (explaining that the difference between "arbitrary and capricious" and "reasonableness" review "is not of great pragmatic consequence")).

Generally, when reviewing an agency action under the APA, a Court is limited to the administrative record before the agency at the time of its decision.   *Camp v. Pitts*, 411 U.S. 138, 142 (1973).   This limitation applies to Count Four, which challenges the Army Corps' decision to issue the section 404 permit that is at issue in this case.   However, because "a NEPA suit is inherently a challenge to the adequacy of the administrative record, . . . 'courts generally have been willing to look outside the record when assessing the adequacy of an EIS or a determination that no EIS is necessary.'" *Aracoma*, 556 F.3d at 201 (quoting *Webb v. Gorsuch*, 699 F.2d 157, 159 n.2 (4th Cir. 1983) (citing *Cnty. of Suffolk v. Sec'y of Interior*, 562 F.2d 1368, 1384 (2d Cir. 1977))). As explained more fully in the Memorandum Opinion and Order denying Defendant's Motion to Limit Judicial Review to the Administrative Record, ECF No. 36, extra-record evidence has been considered with regard to Plaintiffs' NEPA claim and evidence explaining technical information or agency action not adequately explained in the record.[5]   Though the Court can consider extra-record evidence under the NEPA exception, it is nonetheless not "empowered to substitute its judgment for that of the agency."   *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416 (1971), or to "substitute the judgment of plaintiff's experts for that of the agency's experts." *Aracoma*, 556 F.3d at 201.

## Discussion

In an earlier Order, the Court granted summary judgment for the Corps with regard to

---

[5] At the week-long evidentiary hearing held in this case, the Court heard testimony from expert witnesses called by the Plaintiffs and by Highland.   The Corps called the employee who authored the Combined Decision Document as a witness, but called no experts of its own. Throughout the testimony, the parties and the Court were careful not to admit post-permit evidence in support of the merits of Plaintiffs' claims, though post-permit scientific data was offered and used for impeachment and rehabilitation of witnesses.

Plaintiffs' challenges to the CMP.   The rationale for that decision is set forth below.   In addition, the Court resolves the only remaining issues: whether the cumulative impact assessment embodied in the Combined Decision Document ("CDD") was arbitrary and capricious in violation of the APA, the CWA, and NEPA.

**1.  *Aracoma* Controls Plaintiffs' Challenges to the Compensatory Mitigation Plan**

> **A.  Adoption of a Compensatory Mitigation Plan That Will Replace the "Majority" of Stream Functions was not Arbitrary and Capricious.**

Plaintiffs challenge the CMP because, as the Corps concedes, it did not guarantee that "the mitigation stream channels [will] replace all [stream] functions and values lost as a result of the filling of stream channels associated with this proposal."   *CDD*, A.R. Tab 104, at 90.   Elsewhere, the Corps stated that "the proposed mitigation should replace *the majority* of the stream functions lost as a result of the proposal." *Id*. at 96–97 (emphasis added).   Plaintiffs argue that *Aracoma*, 556 F.3d 177 (4th Cir. 2009), in which the Fourth Circuit reversed this Court and went to great lengths to approve of the mitigation measures used by the Corps, does not control this issue.   The basis for distinguishing this case from *Aracoma*, Plaintiffs argue, is that the mitigation plan in *Aracoma* required a one-to-one mitigation ratio, whereas the Reylas CMP resulted in a "mitigation deficit" because it only guarantees replacement of "the majority" of stream functions.   Plaintiffs' argument mischaracterizes the Reylas CDD and CMP.

At the time of the Fourth Circuit decision in *Aracoma*, the Corps did not have a functional assessment tool for use in West Virginia.   *Aracoma*, 556 F.3d at 198.   Since then, the Corps has developed and implemented its own functional assessment approach. *See* Operational Draft Regional Guidebook for the Functional Assessment of High-gradient Ephemeral and Intermittent Headwater Streams in Western West Virginia and Eastern Kentucky, (United States Army Corps

11

of Engineers, July 2010), available at http://el.erdc.usace.army.mil/elpubs/pdf/trel10-11.pdf (last visited August 7, 2012). In 2007, when Highland applied for this permit, the Corps' functional assessment was still being developed. In the absence of the final version, the Corps applied an earlier, interim version of their functional assessment, referred to throughout the CDD as the Interim Functional Assessment Approach ("IFAA"). A.R. Tab 104, at 26–27.

Using the IFAA analysis, the Corps determined that the proposed mine would result in the loss of 28,774 Functional Capacity Units ("FCUs"). To mitigate for this loss, the Reylas CMP requires the creation of 42,146 FCUs. *Id.* at 46. If it is effective, the required mitigation will result in a net gain of 13,372 FCUs. *Id.* With regard to stream length, the CMP requires the creation or restoration of approximately 30,034 feet of stream channel to compensate for approximately 13,478 feet of impacts, for a mitigation ratio of 2.23:1. *Id.* at 25–26.

It is clear that the Corps did not use the word "majority" to describe the mitigation quantitatively. Rather, it reflects recognition by the Corps that stream functions are complex and that quantifying those functions involves a degree of uncertainty. Thus, while the Corps cannot guarantee that every type and amount of stream function will be replaced, it has gone to great lengths to quantify the stream function expected to be lost and to require the creation, through mitigation, of an amount of FCUs in excess of the expected loss. The 2.23:1 mitigation ratio is more than twice the 1:1 ratio approved by the Fourth Circuit in *Aracoma*. Arrival at this ratio involves the type of complex scientific determinations which are entitled to significant deference from this Court. *Aracoma*, 556 F.3d at 201.

Separately, Plaintiffs have argued that the Corps' reliance on stream creation as a mitigation method is arbitrary and capricious. In support, they point out that the Corps no longer

12

uses stream creation for activities authorized under Nationwide Permit 21.  *See Reissuance of Nationwide Permits*, 77 Fed. Reg. 10184, 10207 (Feb. 21, 2012) ("[T]he Corps is not relying on stream creation as a mechanism to provide compensatory mitigation for NWP 21 activities.") Plaintiffs' argument is undermined by the fact that the Corps also modified Nationwide 21 to prohibit its use to authorize discharges used to construct valley fills associated with surface coal mining activities.  *Id*. at 10205.   Thus, while the Corps has excluded stream creation from Nationwide 21, it has also excluded valley fills altogether and has acknowledged that this exclusion will require more surface coal mining operations, like Reylas, to obtain individual § 404 permits.   *Id*. at 10209.   While this Court remains extremely skeptical about the viability of stream creation on which this and other permits rely heavily, the Fourth Circuit has expressly approved of the Corps' use of stream creation as a mitigation measure and has even approved of mitigation which purports to compensate for the permanent destruction of headwater streams by the "creation, enhancement, or replacement of an equal or greater length of some other type of stream."  *Aracoma*, 556 F.3d at 203.

The Fourth Circuit has explained that "in matters involving complex predictions based on special expertise, a reviewing court must generally be at its most deferential."   *Id*. at 201.   The Corps' use of the IFAA analysis, adoption of the CMP, and reliance on stream creation are the sorts of decisions to which this court must be at its most deferential.   Based on this deference, and the narrow review prescribed by the APA, the Court cannot conclude that the Corps' reliance on stream creation or adoption of the CMP was arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law.   5 U.S.C. § 702(2).

### B. Adoption of Reylas' Adaptive Management Plan was not Arbitrary & Capricious

Near the end of the Reylas CMP is a section entitled "Adaptive Management Plan" ("AMP"). Among other things, the AMP recognizes that "[s]uccess of mitigation projects depend[s] largely on the ability to respond to changing conditions and circumstances." *CMP*, A.R. Tab 58, at 144. Plaintiffs argue that the Corps' adoption of the AMP in this permit was arbitrary and capricious because the Corps did not adopt the specific recommendations contained in the EPA's comment letters. The Corps responds that the AMP is the Corps' most effective way of ensuring future compliance because it keeps all future compliance options open for future use. While the AMP does not require specific remedial actions in the event that mitigation is unsuccessful, it gives the Corps the right to require compliance in any way that the Corps sees fit. In light of the inherent uncertainty in the mitigation process already discussed above, and the deference that is due to the Corps under *Aracoma*, the Court cannot conclude that the adoption of the AMP was arbitrary & capricious.

Plaintiffs' reliance on *Ohio Valley Envtl. Coal. v. Hurst*, 604 F. Supp. 2d 860 (S.D.W. Va. 2009) is misplaced. In that case, the Corps issued Nationwide Permit 21 after determining that the permit would not have a significant impact on the human environment. Nationwide Permit 21 relied on a process requiring individual permittees to submit a preconstruction notification ("PCN") which would be reviewed on a case-by-case basis. Through the PCN process, the Corps could add specific permit conditions and compensatory mitigation requirements. *Id*. at 889. Judge Goodwin concluded the PCN process lacked sufficient assurances that it would lead to actual, successful mitigation. Judge Goodwin also found that the Corps had failed to show that the process would be adequately policed because, inter alia, the Corps did not include a monitoring plan as a general condition of Nationwide Permit 21. *Id*. at 890–91.

14

The *Hurst* decision is inapposite.   Here, the Corps required very specific mitigation measures at the time that Reylas' permit was issued.   In contrast to the process for authorization under Nationwide Permit 21, issuance of Reylas' permit involved a detailed investigation of the proposed project and the imposition of specific mitigation requirements before the permit was issued.   See CMP, A.R. Tab 58, at 3–156.   The CMP contains detailed monitoring requirements. *Id*. at 141.   In particular, the monitoring plan for this permit requires Highland to collect and analyze water chemistry data for a wide variety of parameters, including Total Suspended Solids ("TSS"), Total Dissolved Solids ("TDS"), and a number of specific ions known to be constituent ions of water conductivity.   Monitoring Requirements, A.R. Tab 58, at 141.   As a special condition of the permit, Highland is required to "include a trend line analysis of conductivity and WVSCI scores to be used as an early warning tool in the event [that] the monitoring indicated impairment."   Special Condition 29, A.R. Tab 105, at 11–12.   While the Corps declined to adopt a specific conductivity trigger to use as a measure of success, the Special Conditions identify a three month average WVSCI score of 68 at sampling station S-9 as a measure of success.   *Id*. Site S-9 will be located on Bandmill Hollow directly below the sediment pond at the toe of the proposed fill.   Drainage Map, A.R. Tab 105, at 4.   This location will monitor the water quality directly from the fill and avoid any diluting effect as the mine effluent flows down Bandmill Hollow into Dingess Run.

The CMP and permit also contain the AMP, the so-called "Plan B", which provides specific timelines for corrective actions if monitoring reveals noncompliant scores.   AMP, A.R. Tab 58, at 144; Special Conditions 28–30, A.R. Tab 105, at 11–12.   In the AMP, the Corps reserves the right to modify the CMP to account for unforeseen conditions, including the right to

15

require additional mitigation in the event that the planned mitigation is unsuccessful.   *Id*.   The AMP does not specify the measures that will be required in the event that the mitigation is unsuccessful.   However, unlike *Hurst*, the AMP is not the mitigation plan of first resort.   In *Hurst*, the Corps relied on a nonspecific and generalized statement that mitigation would be required in the future.   In this case, the AMP is a subsection of the much larger CMP, which contains detailed and specific mitigation requirements along with a monitoring plan.

### C.  The Corps' Temporal Loss Calculation is not Arbitrary & Capricious

Plaintiffs argue that the temporal loss formula adopted by the Corps is arbitrary and capricious because there is no explanation for the Corps' determination to measure temporal loss at 3% per year until the time that mitigation begins.   In this case, that was estimated to be five years, and the temporal loss of 3% per year for five years resulted in a 15% increase in compensatory mitigation to account for temporal loss.   Plaintiffs point out that there is no rational basis to end this calculation at the time that mitigation begins since temporal loss continues up until the time that mitigation is complete.   In fact, since this permit was issued, the Corps has changed this method and, for new permits, the Corps calculates temporal loss at 3% per year until mitigation is mature.   While this change in practice casts doubt on the calculation used in the Reylas permit, it does not lead the Court to conclude that the original methodology was arbitrary and capricious.

First, no comments identified the temporal loss methodology as a contested issue, which is likely why the Corps did not explain it in the CDD.   Second, not all of the impacts of mining occur at once, and the sequencing of impacts is described in detail in the SMCRA permit.   Like impacts, mitigation measures do not begin, end, or reach maturity simultaneously.   Rather, mitigation and

impacts occur over an extended period of time.   The Reylas permit was modified so that valley fill construction would begin from the toe and proceed upward, allowing reclamation efforts to begin at the toe of the fill before the upper reaches of the fill are completed.   All these factors, and likely others, are relevant to the selection of a formula for calculating temporal loss.   The Corps' arrival at a particular formula, like the use of stream creation or particular mitigation measures, is a scientifically complex determination and is entitled to significant deference.   The Court cannot say that the use of this formula was arbitrary and capricious.

## 2.   The Finding of No Significant Impact was not Arbitrary and Capricious

Plaintiffs challenge the FONSI on a number of grounds.   In Count One of the Second Amended Complaint, Plaintiffs claim that an EIS was required because the project will have significant water quality impacts.   Count One also alleges that the Corps arbitrarily and capriciously rejected the EPA's comments, and that the Corps had no reasoned basis to conclude that the individual and cumulative impacts of increased levels of sedimentation/siltation, selenium, and conductivity will be individually and cumulatively insignificant.   Count One, which invokes NEPA and the APA, asks the Court to vacate the EA/FONSI and to require the Corps to prepare an EIS before reissuing the Reylas Permit.

Count Four of the Second Amended Complaint invokes NEPA, the APA, and the CWA. Specifically, Count Four alleges that issuance of the Reylas permit violated the 404(b) Guidelines prohibition on permits which "cause or contribute . . . to violations of any applicable state water quality standard."   40 C.F.R. § 230.10(b)(1).   The thrust of Plaintiffs' argument is that there is no scientific basis supporting the Corps conclusion that the Reylas Surface Mine will not cause or contribute to a violation of the applicable State water quality standard.

Before turning to these complicated questions, the Court must first decide the legal effect of an Army Corps regulation that gives conclusive effect to a State CWA § 401 certification "with respect to water quality considerations unless [EPA's Regional Administrator] advises of other water quality aspects to be taken into consideration."   33 C.F.R. § 320.4(d).

### A.  The Conclusive Effect of a Clean Water Act Section 401 Certification

The parties propose very different views of the application of § 320.4(d) in this case. Section 320.4 reads, in pertinent part:

> The following policies shall be applicable to the review of all applications for DA permits. . . .
>
> (d) Water quality. Applications for permits for activities which may adversely affect the quality of waters of the United States will be evaluated for compliance with applicable effluent limitations and water quality standards, during the construction and subsequent operation of the proposed activity. The evaluation should include the consideration of both point and non-point sources of pollution. It should be noted, however, that the Clean Water Act assigns responsibility for control of non-point sources of pollution to the states. Certification of compliance with applicable effluent limitations and water quality standards required under provisions of section 401 of the Clean Water Act will be considered conclusive with respect to water quality considerations unless the Regional Administrator, Environmental Protection Agency (EPA), advises of other water quality aspects to be taken into consideration.

Plaintiffs argue that the Corps cannot rely on the State § 401 certification to satisfy its obligation to assess the cumulative impacts of the Reylas permit under NEPA and the 404(b) Guidelines.  In doing so, they ask the Court to draw a distinction that is not readily discernible from the regulations and is contrary to the Corps' interpretation of this particular rule.  Though this issue was not directly presented to the Fourth Circuit Court of Appeals in *Aracoma*, it was at least implicit in that decision that state determinations regarding cumulative impacts can be relied upon by the Corps.  *Aracoma*, 556 F.3d at 208 ("[T]he Corps views the state water quality

certification as satisfying the water quality portion of cumulative impact analysis. . . .   A § 401 certification is considered conclusive, and no independent analysis of the certification is required.") (internal citation omitted).   The Fourth Circuit also cited *Bering Strait Citizens for Responsible Res. Dev. v. U. S. Army Corps of Eng'rs*, 524 F.3d 938 (9th Cir. 2008) with approval. In *Bering Strait*, the Ninth Circuit held that the Corps was entitled to rely upon the State § 401 certification to satisfy its obligations under NEPA.   *Id*. at 956.   The Court will not accept Plaintiffs' invitation to parse the Army Corps regulation so closely.   There is no dispute that the Corps has an obligation to consider the cumulative impacts of Highland's permit.   However, the WVDEP is the primary resource agency responsible for water quality, and it is reasonable for the Corps to rely on the State § 401 certification in its assessment of the cumulative impacts on water quality, "unless advised by the EPA of other water quality aspects to be taken into consideration." 33 C.F.R. § 320.4(d).

That the Corps can, in appropriate circumstances, rely on a State § 401 certification when assessing the cumulative impacts of a proposed permit, does not mean that the Corps could do so in this case, where EPA submitted several letters outlining "other water quality aspects to be taken into consideration."   *Id*.   Highland and the Corps both contend that West Virginia's § 401 certification is conclusive in this case with regard to water quality considerations, though they disagree as to why the EPA's comment letters are not effective to remove the conclusive effect described in § 320.4(d).

Highland argues that the EPA's comments were not submitted within the period for public comment, were untimely, and therefore do not remove the conclusive effect of West Virginia's § 401 certification.   The public comment period for this permit ran from March 25 until April 24,

2008.  The WVDEP issued its § 401 certification on October 1, 2008, and the EPA sent its first

comment letter on March 23, 2009.   Though there is no regulation binding the EPA to the public

comment period,[6] Highland argues that a 1992 interagency memorandum has this effect.  *See*

Memorandum of Agreement Between the Envtl. Prot. Agency and the Dep't of the Army

("MOA")           (August           11,           1992),           available           at

http://water.epa.gov/lawsregs/guidance/wetlands/upload/1992_MOA_404q.pdf    (last      visited

August 7, 2012).[7]    Highland cites *Nat'l Mining Ass'n v. Jackson*, 816 F. Supp. 2d 37 (D.D.C.

2011) for the proposition that the EPA and the Corps are bound by and cannot vary from the timing

requirements of the MOA.   The MOA, however, expressly states that "the Corps may request

additional comments from the EPA or discuss issues with the EPA after the close of the comment

period."   MOA at 5; *See also NMA v. Jackson*, 816 F. Supp. 2d at 40.   The administrative law

issue presented here, consideration by the Corps of comments by another agency outside of the

period for public comment, pales in comparison to the issue in *NMA v. Jackson*, where the EPA

sought to unilaterally impose a new and demanding enhanced coordination process that was found

to be inconsistent with the allocation of duties under § 404 of the Clean Water Act and without

---

[6] At oral argument, Highland contended that 33 C.F.R. § 325.2(b)(1)(i) requires the EPA to act within the public comment period.  This rule parrots the language of 33 U.S.C. § 1341(a)(2), which requires the EPA to notify the permitting agency and neighboring states if it believes that a permit proposed in one state may affect water quality in another state.  Section 325.2(b)(1)(i) is designed to ensure that all parties receive adequate notice of potential interstate impacts of permit decisions.  The rule has nothing to do with § 404(b) Guidelines and is of no import to this case.

[7] The MOA was adopted pursuant to § 404(q) of the Clean Water Act, which obligates the Corps to enter into agreements with other agencies "to minimize, to the maximum extent practicable, duplication, needless paperwork, and delays in the issuance of permits under this section."   33 U.S.C. § 1341(q).

proper notice and comment under the APA.   *NMA v. Jackson*, 816 F. Supp. 2d at 42–49.

Highland's view would require the EPA to raise water quality concerns without knowledge of the State's § 401 certification.   There is no language in 33 C.F.R. § 320.4(d) suggesting that the EPA must raise water quality concerns within the thirty day public comment period and, tellingly, the Corps does not interpret § 320.4(d) or any other rule to require the EPA to raise water quality concerns within the public comment period.   As noted by the Washington, D.C. District Court, the EPA plays a limited role in § 404 permitting; the Corps is ultimately responsible for § 404 permit decisions.   *NMA v. Jackson*, 816 F. Supp 2d at 39–40, 44.   In defining that relationship, the Corps adopted 33 C.F.R. 320.4(d), which permits the EPA to bring "other water quality aspects" to the Corps' attention.   The Corps does not believe that these concerns must be raised within the public comment period, an interpretation that is entitled to deference and is consistent with the allocation of duties in the CWA § 404 permit program.

This conclusion finds further support in the language of CWA § 404(q), which provides that agreements like the MOA "shall be developed to assure that, to the maximum extent practicable, a decision with respect to an application for a permit . . . will be made not later than the ninetieth day after the date the notice for such application is published . . . ."   *Id*.   Here, the State § 401 certification, a necessary prerequisite to the permitting decision, was not issued within that 90-day timeframe.   The MOA may reflect the ideal process for interaction between these two agencies, but both the MOA and CWA § 404(q) recognize the need for practical exceptions.   The view of the Plaintiffs and the Corps is both reasonable and undoubtedly correct.   It would be impracticable to require the EPA to raise water quality concerns without the opportunity to review the State § 401 certification.

While the Corps does not believe that the EPA's comment letter was untimely, both Highland and the Corps contend that the letter did not remove the conclusive effect of the State § 401 certification because it was not signed personally by the EPA Regional Administrator.   The Corps' asserted position, that it was under no obligation to consider the EPA comments and its decision to do so was merely an exercise of agency discretion, is belied by the agency's conduct in this case.[8]   The author of the EPA comment letter unequivocally invoked 33 C.F.R. § 320.4(d):

> While we recognize that matters involving compliance with water quality are generally deferred to the state's certification pursuant to Section 401 of the Clean Water Act, other water quality aspects brought to the Corps' attention by EPA must be considered.   33 C.F.R. 320.4(d).   Thus, water quality impacts must be considered as part of the permit review process.   *See* 33 C.F.R. 320.4(d)

A.R. Tab 46, at 2.   It is undisputed that the Corps did not treat the State § 401 certification as the beginning and end of its obligation to consider all water quality issues.   Instead, the Corps initiated a dialogue on the issues raised by the EPA in the agency's comment letters.   The Corps hosted a meeting involving itself, the WVDEP, the EPA, Highland, and then-Governor Joe Manchin.   The record in this case contains detailed interagency discussions, none of which suggest that the EPA comment letter did not have the precise effect that its author clearly intended, and none of which suggest that the Regional Administrator needed to personally sign those letters.

---

[8]  Though no party has cited it, the notes from a March 18, 2009 telephone conference lend some support to the Corps' position.   The notes indicate that Mr. Lance Wood, a representative of the Office of Counsel from Army Corps Headquarters, "referenced 33 CFR 320.4(d) and stated that . . . [c]ertification of compliance . . . under section 401 will be considered conclusive unless the Regional Administrator, Environmental Protection Agency (EPA) advises of other water quality aspects to be taken into consideration."   Later, "Mr. Woods [sic] said the USACE must follow its regulations and the Regional Administrator should have provided concerns or objections earlier in the process."   A.R. Tab 45, at ¶16.   This single statement, embodied in a note from a conversation that predates the EPA's comment letters, is not sufficient to contradict the lengthy course of conduct undertaken by the Corps subsequent to its receipt of the EPA comment letters.

In briefing the pending motions for summary judgment in this case, the Corps expressly acknowledged that, through its March 2009 letter, "EPA Region III advised the Corps of its concern that conductivity levels resulting from the Reylas project could lead to an excursion from West Virginia's narrative water quality standard . . . .  Accordingly, the Corps did not consider WVDEP's Section 401 certification to be 'conclusive' with respect to conductivity."   ECF No. 117, at 15–16.  At the evidentiary hearing, when Plaintiffs' counsel asked the Corps' witness about the effect of the § 401 certification, counsel for the Corps objected and stated, "Your honor, he's asking her for basically a legal opinion that's already been articulated in the United States' briefs."  Tr. at 595.  In response to the question, the witness testified that the Corps did not believe the State § 401 certification to be conclusive with respect to issues raised by the EPA.   Tr. at 596.

The Corps' position is that it was under no obligation to consider the EPA's comments. The only evidence cited by the Corps is a guidance letter which post-dates the agency's decision in this case and is, at best, ambiguous with regard to the Corps' position.   Memorandum for Major Subordinate Commands and District Commands (October 29. 2009), ECF No. 177-1.   Nowhere does the Memorandum require the actual signature of the Regional Administrator rather than a subordinate.   The EPA unequivocally invoked the relevant regulation, and the course of conduct in this case clearly shows that the Corps did not treat the State § 401 certification as conclusive. The Court **FINDS** that the March 2009 EPA comment letter and the subsequent letters detailing the EPA's concerns were sufficient to remove the conclusive effect of the State § 401 certification with regard to water quality concerns raised by those letters.   As for their scope, the Court is of the view that the EPA comment letters removed the conclusive effect of the State § 401 certification

23

with regard to conductivity and cumulative impacts, but not with regard to selenium.   The EPA did not mention selenium in the March or April 2009 letters, and selenium is mentioned only in passing in the September 2009 letter.   This passing reference is not sufficient to remove the conclusive effects of the State § 401 certification for selenium.[9]

### B.  The Cumulative Impacts and Conductivity Determinations

Having resolved the conclusive effect of the § 401 certification, the Court now turns to the merits of the Plaintiffs' case.   Plaintiffs' remaining claims present two separate but related questions.   First, whether the Corps acted arbitrarily and capriciously in concluding that the Reylas permit is not likely to have a significant impact on the environment, when considered in conjunction with past, present, and foreseeable future actions.   Second, whether the Corps' decision that the Reylas permit would not result in violations of state water quality standards is arbitrary and capricious in violation of the APA, NEPA, and CWA § 404.

### 1.  NEPA Does Not Require the Corps to Retain Experts

Plaintiffs argue that *Hughes River Watershed Conservancy v. Glickman*, 81 F.3d 437 (4th Cir. 1996) requires the Corps to retain a biologist or other "qualified expert" capable of taking a "hard look" at the impacts of the Reylas permit.   Plaintiffs emphasize *Glickman*'s statement that

---

[9] Even if it were, and to the extent that selenium is a factor in cumulative impact assessment, the Corps provided a reasonable basis for concluding that the Reylas mine will not violate state water quality standards or result in significant impacts to the human environment. Unlike conductivity, the WV NPDES and SMCRA permits directly regulate selenium.   The Corps specifically relied on the effluent limitation in the WV NPDES permit along with a number of components of the SMCRA permit, including the Toxic Materials Handling Plan, Cumulative Hydrologic Impact Assessment ("CHIA"), Probable Hydrologic Consequences ("PHC"), and Surface Water Runoff Analysis ("SWRA").   Broadly, these elements of the SMCRA permit require Highland to identify selenium-bearing rock and to bury it above the shelf of the valley fill in a location intended to reduce exposure to surface and groundwater.   A.R. Tab 104 at 23–24.

"the record provides no basis for determining . . . whether the [Corps'] employees were qualified to render opinions about zebra mussel infestation." *Id*. at 445.   The remainder of the *Glickman* opinion focuses on the conduct of the Corps' employees; their qualifications are not mentioned again, and the quoted reference refers only to the absence of evidence in the record regarding their qualifications.[10]   It would not be practicable, and *Glickman* does not suggest, that the Corps is required to retain experts in the myriad of issues which it confronts across the nation on a daily basis.   *Glickman* does consider, as do all courts when reviewing a claim that under NEPA, the conduct of the agency in reviewing and responding to comments both from the public and from other resource agencies like the EPA.

## 2.   The Corps did not Misapprehend the Baseline Conditions in Dingess Run

In their motion for summary judgment, Plaintiffs argue that the FONSI is arbitrary and capricious based on a number of statements in the CDD that characterize water quality in the affected watershed as generally good despite the fact that Dingess Run has been placed on West Virginia's CWA §303(d) list of impaired streams.   *See* 33 U.S.C. § 1313(d).   In support of this argument, Plaintiffs emphasize a pair of recent cases from the Fourth Circuit Court of Appeals which were not briefed but which merit discussion. In the first, *North Carolina Wildlife Fed'n v. North Carolina Dep't of Transp.*, 677 F.3d 596 (4th Cir. 2012), the Fourth Circuit vacated and remanded a district court's approval of an EIS prepared in conjunction with the construction of a

---

[10]   It was not disputed that Ms. Kimberly Courts-Brown, the author of the Reylas CDD, has a Bachelor's Degree in chemistry and has been employed by the Army Corps of Engineers for more than 20 years.   She has been working on coal mining related projects for at least 10 years and, in 2008, the year that the Reylas permit issued, the Corps named Ms. Courts-Brown Regulator of the Year.

proposed interstate connector project.   The basis for rejecting the EIS was that the data used for calculating the "no build" baseline inaccurately assumed that the proposed project would in fact be built.   *Id*. at 602.   This fundamental misapprehension of the baseline conditions made it, "impossible to accurately isolate and assess the environmental impacts of the [proposed project]." *Id*.   In the second, *Friends of Back Bay v. U.S. Army Corps of Eng'rs*, 681 F.3d 581 (4th Cir. 2012), the Fourth Circuit vacated a district court decision which affirmed the use of a mitigated FONSI by the Corps to approve construction of a mooring facility and boat ramp near the Back Bay National Wildlife Refuge in Virginia Beach, Virginia.   *Id*. at 583.   The primary reason for vacating the Corps' decision and remanding the permit for an EIS was that the FONSI assumed compliance with a no wake zone established to protect the refuge, but provided no reasonable basis for this conclusion.   *Id*. at 588.   The evidence in that case showed that, five years after its establishment, the no wake zone "remained unmarked and undisclosed to the public," and that the Corps was "'hopeful' that the public would comply with the secret [no wake zone]."   *Id*.   Citing *North Carolina Wildlife Federation*, the Fourth Circuit stated that "a material misapprehension of the baseline conditions existing in advance of an agency action can lay the groundwork for an arbitrary and capricious decision," and that, "courts not infrequently find NEPA violations when an agency miscalculates the 'no build' baseline or when the baseline assumes the existence of a proposed project."   *Id*.

In reliance on these cases, Plaintiffs contend that the Corps materially misapprehended the baseline conditions in Dingess Run. The Court disagrees.   In §7.3.2 of the CDD, the Corps explained the gathering and analysis of baseline water quality characteristics of Reylas Fork, its small unnamed tributaries, and Bandmill Hollow.   The data revealed high conductivity in some of

the streams but generally good habitat and benthic scores.   These findings set a goal for measuring compensatory mitigation.   A.R. Tab 104, at 30–34.   In its cumulative impacts analysis, §11 of the CDD, the Corps described the conditions of Reylas Fork, Bandmill Hollow, and Dingess Run, and sources of past and present impacts such as mining, timbering, and other activities.   *Id.* at 74–80.   The Corps considered sampling data from Bandmill Hollow and other up-stream tributaries of Dingess Run.   The Corps then discussed the impacts of past mining, including elevated selenium and conductivity levels, and current and proposed activities. Concluding that Dingess Run exhibited water quality which, "has not been impacted to a level of significance," and that, "the watershed would continue to assimilate the mining activities," the Corps found that, with the proposed mitigation and compliance with the SMCRA and NPDES permits, only minimal impacts would result from the permitted activity.   *Id.* at 78.

Plaintiffs' experts strongly dispute the sufficiency of the sampling methodology and contend that the Corps' characterizations of the baseline conditions are materially false because West Virginia has listed Dingess Run as an impaired stream pursuant to § 303(d) of the CWA. *See* 33 U.S.C. § 1313(d).   As to the sampling protocol, the Corps is entitled to deference as the sampling techniques are largely a matter of discretion and professional judgment, with no binding or specific assessment methodology required.   Even though Dingess Run is already impaired according to the WVDEP, the Corps' findings as to baseline conditions are not fatally flawed. First, several of the Corps' references to good water quality in the baseline discussions referred not just to Dingess Run, but also to other perennial and intermittent tributaries that make up the Dingess Run watershed.   A.R. Tab 104, at 81.   The Corps also conceded in the CDD that conductivity and selenium have been elevated, so its description of the watershed was not

materially false.  *Id.* at 81–82.  Further, its ultimate conclusions about the cumulative impacts and the compensatory mitigation and monitoring took into consideration how this permit will affect downstream water quality in Dingess Run.  The § 303(d) listing identifies biological impairment as the reason for the listing, but does not attribute its cause to a particular type of activity or water quality characteristic.  The Corps noted that multiple stressors from a range of past and present activities, including pre-SMCRA mining, have affected the watershed.  *Id.* at 76–77, 80–83.  The agency did not materially misapprehend the baseline conditions in the Dingess Run Watershed.

### 3.  The Corps' Cumulative Impact Assessment was not Arbitrary and Capricious

At trial, Plaintiffs presented unrefuted evidence of a correlation between mining, elevated conductivity, decreased WVSCI scores, and the loss of sensitive benthic macroinvertebrates in streams below valley fills.  The testimony of Plaintiffs experts was compelling, and the efforts by the Corps and Highland to discredit them were in vain.  The Court is thoroughly convinced that large scale surface mining is strongly correlated with elevated levels of conductivity and the loss of sensitive macroinvertebrates downstream of valley fills.  This conclusion, however, is not enough to vacate the Corps' decision on the Reylas permit.

The central issue in any NEPA claim is whether the administrative agency has taken the requisite "hard look" at the environmental impacts of its actions.  Here, Plaintiffs and the EPA brought conductivity and the cumulative impacts of mountaintop removal mining to the attention of the Corps.  Faced with these concerns, the Corps solicited responses from Highland, held meetings and calls with interested parties, and responded to these environmental concerns in the comments section and the body of the CDD.  The administrative record documents the extensive

interaction among the Corps, the EPA, the WVDEP and Highland to resolve the EPA's concerns. Though Highland and the WVDEP disputed the EPA's position on conductivity and cumulative water quality impacts of valley fills, the Corps focused on site-specific factors which provide at least a rational basis for its decision. Those factors include the use of Best Management Practices ("BMPs") designed specifically to reduce the potential discharge of effluent with high conductivity and related total dissolved solids ("TDS") and total suspended solids ("TSS"). A.R. Tab 104, at 25. For instance, the mine must use large, durable sandstone and similar materials in the valley fills, which will help reduce conductivity and TDS in water flowing through the fill. *Id*. In addition to BMPs, the monitoring plan was modified, in response to the EPA's concerns, to measure a number of water quality parameters and to include a trend line analysis of conductivity and WVSCI scores as an early warning tool. *See* Special Conditions 28 & 29, A.R. Tab 105, at 12–13.

While not adopting all of the EPA's suggestions for addressing conductivity and water quality cumulative impacts, the Corps did take a "hard look" at the concerns raised by the EPA. Ultimately, the measures taken in the CDD and the Special Conditions adopted in response to the EPA all reduce the likelihood of significant water quality impacts and increase the post-permit monitoring and mitigation requirements. The permit was issued by the Corps without formal objection by the EPA at a time when the EPA claimed its purported veto authority. *See Mingo Logan Coal Co. Inc. v. U.S. Envtl. Prot. Agency*, — F. Supp. 2d —, 2012 WL 975880 (D.D.C. March 23, 2012).

The agency had before it a wide array of evidence about water quality and the effects of conductivity including the SMCRA permit, the NPDES permit, the § 401 certification, and the

studies provided by the Plaintiffs and the EPA.   The CDD reflects a substantive review of these materials, after which the Corps concluded that the individual and cumulative environmental impacts of this permit would not rise to the level of significance required to trigger an EIS.   The Corps' conclusion that the cumulative impacts of this project will be insignificant is very troubling in light of Dingess Run's placement on West Virginia's 303(d) list, the past and future mining and logging in this watershed, and the lack of an NPDES effluent limitation for conductivity. However, even where the science is clear (Highland's experts did not disagree) that surface mining activities are strongly correlated with increases in conductivity and declining biodiversity, judicial review of the Corps' decision is narrow.   The concerns raised by Plaintiffs and the EPA are exclusively water quality concerns.   In the complicated regulatory scheme governing surface mining operations, the Corps does not have primary responsibility for water quality.   Under the Clean Water Act, that responsibility lies with WVDEP and the NPDES permit, not the § 404 permit.   It is not unreasonable for the Corps to rely on the expertise of the WVDEP, the agency with primary responsibility for water quality, in determining that impacts on water quality will be insignificant. The Corps has analyzed the cumulative impacts, "articulated a satisfactory explanation for its conclusion," and thus has not acted arbitrarily or capriciously. *Aracoma*, 556 F.3d at 209.   Because the decision to issue a permit necessarily includes the decision that the permit will not result in a violation of state water quality standards, this analysis applies with equal force to Plaintiffs' § 404(b) claim.   The Corps did not act arbitrarily and capriciously when it examined the evidence before it and concluded that the Reylas permit would not result in a violation of applicable water quality standards.

**Conclusion**

30

Miles of West Virginia streams are being buried under valley fills covering hundreds of acres, dramatically altering the landscape and streams throughout southern West Virginia. The EPA and the WVDEP have been at loggerheads in evaluating these impacts and taking action to strike the balance between the State's economic interests in mining and its obligation to protect West Virginia's environment. This Court must adhere to the guiding principles of deference under *Aracoma* in ruling on Plaintiffs' challenges to the Corps' decision, despite substantial scientific evidence contrary to that decision. The Army Corps of Engineers decision to issue a CWA § 404 permit to Highland Mining Company for the construction of a valley fill and sediment pond in conjunction with the Reylas Surface Mine was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. The United States Cross-Motion for Summary Judgment (ECF No. 116) is **GRANTED**. Intervenor-Defendant Highland Mining Company's Motion for Summary Judgment (ECF No. 96) is **GRANTED**. Plaintiffs' Motion for Summary Judgment (ECF No. 94) is **DENIED**. The Court **DIRECTS** the Clerk to send a copy of this written Opinion and Order to counsel of record and any unrepresented parties. A separate judgment order will be entered along with this Memorandum Opinion and Order.

ENTER:    August 10, 2012

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE